IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KENDON AUSTIN,
individually and on behalf of all others
similarly situated,

    Plaintiff,

       v.

N3 LLC
doing business as
N3 Results, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:21-CV-1354-TWT

### OPINION AND ORDER

This is a Fair Labor Standards Act case. It is before the Court on the Plaintiff's Motion for Conditional Certification to Proceed Collectively and for Court-Supervised Issuance of Notice to the Putative Class [Doc. 42]. For the reasons set forth below, the Plaintiff's motion is GRANTED in part and DENIED in part.

### I.   Background

The Plaintiff, Kendon Austin, began working in the Defendant N3 LLC's ("N3") Atlanta office in April 2017 through a temporary staffing agency. (Compl. ¶ 23.) N3 is an "outsourced inside sales firm" and a wholly owned subsidiary of the Defendant Accenture LLP ("Accenture"). (*Id.* ¶¶ 53, 55.) The Plaintiff was hired as Business Development Representative ("BDR") tasked with making outbound solicitations on behalf of N3's clients to engage potential

customers. (*Id.* ¶¶ 23, 31, 38.) The Plaintiff was not responsible for ultimately making a sale but instead engaging customer leads for N3's clients and then referring these leads to the client's in-house sales team. (*Id.* ¶ 38.) In January 2018, the Plaintiff was hired directly by N3 and assumed the title of Customer Success Manager ("CSM"), though he alleges his job duties did not change and he did not take on any management or supervisory responsibilities. (*Id.* ¶ 25.) The Plaintiff's job performance was measured by several key performance indicators ("KPIs"), including outbound communications and appointments made. (*Id.* ¶ 29.) Upon being hired, the Plaintiff was under the belief that the position required 40 hours of work per week, and that he would be compensated through a salary and eligibility for monthly and quarterly bonuses depending on his KPIs. (*Id.* ¶ 31.) However, the Plaintiff found it necessary to work more than 40 hours per week to complete his duties and meet his KPI targets. For example, the Plaintiff alleges that he routinely worked through his hour-long lunch break and had to continue work after the end of his shift or on weekends. (*Id.* ¶¶ 44–48.) The Plaintiff further alleges that this uncompensated overtime work was known to and encouraged by his employers. (*Id.* ¶ 50.)

As a result, the Plaintiff brought this action against N3 and Accenture for failure to pay overtime wages pursuant to the Fair Labor Standards Act ("FLSA"). *See* 29 U.S.C. § 216(b). Further, the Plaintiff alleges that many of his fellow employees experienced similar conditions. (*See, e.g.*, Compl. ¶¶ 29,

39, 44, 99.) The Plaintiff now seeks conditional certification to proceed collectively on behalf of himself and similarly situated employees.

## II. Discussion

Under the Fair Labor Standards Act, similarly situated employees who have worked overtime without pay can bring collective actions against their employer. *See* 29 U.S.C. § 216(b). Unlike traditional Rule 23 class actions, employees seeking to participate in a § 216(b) collective action must affirmatively opt in to become a party. *See id.* In this way, "the decision to certify the action, on its own, does not create a class of plaintiffs[;]" instead, the class only exists insofar as other employees join the collective action. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008). "The benefits of a collective action depend on employees receiving accurate and timely notice so that they can make informed decisions about whether to participate." *Id.* (internal quotation marks and punctuation omitted). The Eleventh Circuit has adopted a two-step procedure for certifying § 216(b) collective actions. In the first step—known as "the notice stage" or "conditional certification"—"a district court determines whether other similarly situated employees should be notified." *Id.* at 1260–61. This decision may be reexamined at the second step, which begins once an employer moves for decertification before the action goes to trial. *Id.* at 1261.

### A. Conditional Certification

This motion is one for conditional certification. At this stage, the

Plaintiff "has the burden of showing a 'reasonable basis' for his claim that there are similarly situated employees." *Id.* at 1260. This burden is not a heavy one. In fact, the Court's "broad discretion at the notice stage is . . . constrained, to some extent, by the leniency of the standard for the exercise of that discretion." *Id.* at 1261. Courts generally grant conditional certification where "there are other employees of the [employer] who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Dybach v. Fla. Dep't of Corrs.*, 942 F.2d 1562, 1567–68 (11th Cir. 1991); *see also Jackson v. Fed. Nat'l Mortgage Ass'n*, 181 F. Supp. 3d 1044, 1052 (N.D. Ga. 2016) (applying this framework). The Plaintiff has filed declarations of other employees who wish to join this putative collective action. Thus, the only inquiry for this Court is whether these employees are "similarly situated" under FLSA.

The Plaintiff argues that there exists a group of the Defendant's employees with various titles but comparable duties who were similarly denied overtime compensation. These employees, who the Plaintiff refers to as Inside Sales Representatives ("ISRs"), include individuals with titles such as BDR, CSM, Inside Sales Account Manager ("ISAM"), and Senior Inside Opportunity Manager ("SOM"). (Pl.'s Br. in Supp. of Certification, at 8.) In support, the Plaintiff provides a variety of declarations from ISRs that he alleges indicate similarities in responsibilities and compensation structure, and that they all routinely worked overtime hours that the Defendants knowingly failed to

4

compensate. (*Id.* at 8–17.)

The Defendants respond to these claims individually. First, N3 emphasizes the differences between the declarations submitted by the putative Plaintiffs and the fact that these individuals were paid overtime. (Def. N3's Br. in Opp'n to Certification, at 12.) In N3's view, the declarations do not allege a common scheme or policy of denying overtime pay, and certification of this collective action would leave the Court "with the overly burdensome and unmanageable task of conducting hundreds (or here thousands) of mini-trials involving every employee's individual overtime claim." (*Id.* at 14.) N3 further emphasizes the policies found in their employee manual that prohibit working off-the-clock. (*Id.* at 15–18.) In its Opposition Brief, Accenture notes that it acquired N3 in October 2020, and seventeen of the 18 putative Plaintiffs, including Austin, left N3 before that date. (Def. Accenture's Br. in Opp'n to Certification, at 5.) Accenture further argues that Austin makes no allegations against Accenture in his Complaint beyond claiming that Accenture is a joint employer with N3. (*Id.* at 7.) Accenture contests that characterization, but argues that even if that's true, Austin could never be similarly situated with Accenture employees because he never worked for Accenture. (*Id.* at 11.)

In reply to N3, the Plaintiff argues that the company's policies are not properly considered at this stage of the litigation and that such policies do not affect its claims of a de facto policy. (Pl.'s Br. in Response to N3's Opp'n Br., at 5–6.) Further, the Plaintiff notes that factual differences among the putative

5

Plaintiffs is not fatal to a motion for conditional certification. (*Id.* at 10–11.) In reply to Accenture, the Plaintiff argues that his allegations against Accenture are sufficient at this stage, and the determination of whether Accenture and N3 are joint employers should not be made here. (Pl.'s Br. in Response to Accenture's Opp'n Br., at 7–11.) The Court finds it necessary to address the Defendants claims separately, and it begins with Accenture.

### 1. Accenture

If Accenture's involvement in this case revolved around its status as a joint employer, the Plaintiff's argument that the Court should refrain from making such a determination until the second step of the certification process would be more compelling. However, the issue here is simpler. The Plaintiff and seventeen of the eighteen other employees who submitted declarations left their positions with N3 before the company was acquired by Accenture. FLSA allows the Plaintiff to bring this suit on his own behalf and "other employees similarly situated." 29 U.S.C. § 216(b). However, it cannot be said that the Plaintiff is similarly situated to any Accenture employee, as he left his position with N3 long before the acquisition. As a result, under the plain language of § 216(b), the Court will not certify this collective action as to Accenture. This result does not foreclose separate actions by current N3 employees if they feel they have a FLSA claim against Accenture as a result of similar conditions. However, the Plaintiff is not a proper representative in such a suit against a company that never employed him, and certification is denied as to Accenture.

2. N3

The Plaintiff has satisfied his minimal burden at this stage for certification against N3. At this step, the Court looks for more than "counsel's unsupported allegations that FLSA violations are widespread[.]" *Morgan*, 551 F.3d at 1261 (internal quotation marks and punctuation omitted). The declarations here satisfy the lenient standard of indicating a reasonable basis for finding these employees are "similarly situated" under § 216(b). The Eleventh Circuit has not adopted a precise definition of "similarly situated," as the term is not defined in the statute. *See Morgan*, 551 F.3d at 1259. Instead, its decisions give district courts piecemeal guidance for evaluating these claims. *See, e.g., id.* at 1260 ("[W]e explained what the term does not mean—not what it does.") One such guidepost is that the employee's positions need not be identical to satisfy § 216(b)'s requirements. *See id.* Here, the ISR category as defined by the Plaintiff describes sufficiently similar roles. These employees primarily made outbound solicitations of potential customers for N3 clients and connected these leads with the client's sales teams. (*See, e.g.*, Hinton Dec. ¶ 2–3 (SOM); Wooten Dec. ¶4 (BDR); Howard Dec. ¶¶ 5, 7 (CSM and Senior CSM).) The ISRs' performances were all tracked by similar KPIs related to sales efforts. (*See, e.g.*, Kavanagh Dec. ¶¶ 10–11; Wise Dec. ¶ 12.) Regarding compensation structure, the declarations indicate that the ISRs were all compensated on an hourly basis complemented by bonuses determined by performance against KPI benchmarks. (*See, e.g.*, Stanley Dec. ¶ 4; Moore

7

Dec. ¶¶ 6, 9.) Finally, the allegations involve substantially similar conduct by N3: that management knew employees were working overtime hours, both outside of normal hours and through breaks, and that these hours were not properly compensated. (*See, e.g.*, Phillips Dec. ¶¶ 7–8, 18, 19; Moyer Dec. ¶¶ 21–23, 27.) As N3 noted, these are the two elements of a FLSA overtime claim, which bolsters the sufficiency of the Plaintiff's claims at this stage. (Def. N3's Br. in Opp'n to Certification, at 31.) N3's arguments that these claims "stem from a variety of circumstances based on their own choices" is better suited for the decertification stage. (*Id.* at 24.) These declarations indicate sufficient similarities between these employees at the first stage of conditional certification, and the Plaintiff's motion is granted as to N3.

### B. The Plaintiff's Proposed Notice

The Court now turns to the specifics of the notice proposed by the Plaintiff. The Court has broad discretion over when and how to involve itself in the notice process. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989). The Plaintiff has filed a proposed notice and has requested certain data from N3 to facilitate the notice process, and N3 objects to certain aspects of the Plaintiff's proposal. The Court addresses each contested issue in turn below. However, the Defendant did not object to the Plaintiff's request of a 60-day notice period with the opportunity to send a reminder notice. The Court finds this request reasonable and will allow for a 60-day notice period with an opportunity to send a reminder notice once during the period.

1. Statute of Limitations

Under 29 U.S.C. § 255(a), the statute of limitations for FLSA claims can extend from the typical two-year period to three years where the claims arise out of a "willful violation." The Plaintiff argues that its allegation of willful failure to pay overtime wages is sufficient at this stage. (Pl.'s Br. in Supp. of Certification, at 11.) Generally, this Court has agreed. *See, e.g., Sellers v. Sage Software, Inc.*, Civ. A. No. 1:17-cv-3614, 2018 WL 5631106, at *4.) However, N3 makes a novel argument that the impact of the COVID-19 pandemic on work alters the Court's "similarly situated" analysis, and thus notice should only be sent to "those individuals who physically worked in the Atlanta office within the applicable statu[t]e of limitations and ending on March 16, 2020." (Def. N3's Br. in Opp'n to Certification, at 34.) The pandemic undoubtedly affected the working conditions of N3's employees, as it did with all of the nation's workers. However, whether such considerations should limit the members of the class is a question best reserved for the decertification stage. At that time, the Defendant can raise concerns that certain workers are not similarly situated to the Plaintiff as a result of the pandemic. At this time, the Court finds that the three-year statute of limitations of 29 U.S.C. § 255(a) should apply in the normal fashion here.

2. Distribution of Notice

The Plaintiff seeks to notify potential opt-in plaintiffs through mail, email, text message, and through public postings in N3's break rooms. (Pl.'s

9

Br. in Supp. of Certification, at 34–35.) The Defendant argues that mail and email are sufficient. (Def. N3's Br. in Opp'n to Certification, at 36.) The Court agrees. The use of text messages "is unnecessary and potentially costly for the recipients." *Sellers*, 2018 WL 5631106, at *5. Further, public notice via the break room postings is not sufficiently targeted to similarly situated employees. Thus, the Court deems public posting ineffective and burdensome on the Defendant. Further, the email can include a link to a website containing the notice and consent forms. Websites are likely to be intuitive for opt-in plaintiffs and present the Parties with a simple method of collecting data. The use of a website is approved only if the language on the site matches exactly the notice ultimately agreed upon by the Parties and approved by the Court.

### 3. The Defendant's Obligation to Share Data

The Plaintiff requests various data of the putative plaintiffs from the Defendant: names, physical address, email address, telephone number, and last four digits of the employee's Social Security number. (Pl.'s Br. in Supp. of Pl.'s Mot. for Certification, at 30–32.) The Defendants do not respond specifically to this request, instead asking this Court to require the notice procedure to be administered by a third-party vendor to "promote efficiency and neutrality, protect privacy interests, and reduce the risk of misleading or improper communications with the putative collective." (Def. N3's Br. in Opp'n to Pl.'s Mot. for Certification, at 38–39.) The Plaintiff does not object to the use of a third-party vendor.

With the Court allowing only mail and email notification, and the Plaintiff providing no other convincing rationale, the Court finds it unnecessary to provide telephone numbers and the last four digits of the employees' Social Security numbers. The Defendant is therefore ordered to generate a list of putative plaintiffs and their last known physical address and personal email address. Because the Defendant's request is reasonable and the Plaintiff did not object, the Court orders the Parties to agree upon a third-party vendor to facilitate the notice process and manage the Defendant's data.

### 4. Objections to the Proposed Notice's Content

The remainder of N3's objections relate to the content of the Plaintiff's proposed notice. The Court agrees with many in this Circuit that the "best course is for the parties to work together in good faith to resolve any objections, so that if at all possible, a proposed notice to which all parties have agreed may be submitted to the court." *Didoni v. Columbus Rest., LLC*, 327 F.R.D. 475, 481 (S.D. Fla. 2018) (internal quotation mark). The Court directs the Parties to meet and confer to resolve these pending objections before jointly filing a proposed notice. To support that effort, the Court provides the following guidance on the remaining objections.

First, the Parties dispute the range of employees that should be included within the conditional certification. The Plaintiff's proposed notice would include BDRs, Inside Opportunity Managers ("IOMs"), Senior IOMs, "or any other job title to describe the same or similar positions." (Pl.'s Br. in Supp. of

11

Pl.'s Mot. for Certification, at 39.) N3 objects to this language as too vague. (Def. N3's Br. in Opp'n to Pl.'s Mot. for Certification, at 37.) As the Court noted above, at this stage, the Court has deemed employees whose primary duties involved outbound sales communications to N3's clients as similarly situated under § 216(b). However, it is clear from the declarations that a wide variety of titles engaged in the work. The Parties should agree on specific job titles under which employees engaged primarily with this work and include those roles specifically in the notice. This limitation should prevent ineligible employees from joining the collective.

Second, the proposed notice indicates that attorneys' fees "will be paid on a pure contingency basis, that is, you will not be charged any fees or costs by Plaintiff's counsel unless there is a recovery." (Pl.'s Br. in Supp. of Pl.' Mot. for Certification, Ex. 22, at 4.) This statement could be read by potential opt-in plaintiffs to mean that this process is entirely costless to them. The Defendant argues that the notice should include some language describing the opt-in plaintiffs' potential obligations. The Court concurs, and the Parties should agree upon language that provides a reasonable understanding of the potential costs and involvement required by opt-in plaintiffs. In the same vein, the notice should inform opt-in plaintiffs that they may seek an attorney of their choosing in this matter. Finally, any remaining concerns are best left for resolution by the good-faith collaboration of the Parties. With this guidance in mind, the Court directs the Parties to meet and confer to finalize a proposed

notice for approval from this Court.

### III. Conclusion

For the reasons set forth above, the Plaintiff's Motion for Conditional Certification to Proceed Collectively and for Court-Supervised Issuance of Notice to the Putative Class [Doc. 42] is GRANTED in part and DENIED in part. The Court conditionally certifies this action as a collective action under 29 U.S.C. § 216(b) with regards to N3. Accordingly, the Parties are DIRECTED to work together to reach an agreement on a proposed notice of lawsuit and submit such agreed-upon notice, in a form to be approved by the Court, within 30 days of this Order. If, however, the Parties are unable to reach an agreement, each Party is directed to submit its version of a proposed notice, within the same period, for evaluation and approval by the Court.

SO ORDERED, this <u>2nd</u> day of March, 2022.

/s/ Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge